BRENNAN'S, INC., Plaintiff–Appellant,

v.

BRENNAN'S RESTAURANT, L.L.C., 565 Lexington Avenue Co., LLC., Defendants–Appellees.

Docket No. 03–7382.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 2003.

Decided Feb. 26, 2004.

Edward T. Colbert, Washington, D.C. (William M. Merone, Kenyon & Kenyon, Washington, D.C.; Gregg A. Paradise, Kenyon & Kenyon, New York, New York, of counsel), for Plaintiff–Appellant.

Adam M. Cohen, New York, New York (Dana M. Susman, Kane Kessler, P.C., New York, New York, of counsel), for Defendants–Appellees.

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CARDAMONE, Circuit Judge.

This is an appeal from the denial of a preliminary injunction in a trademark infringement suit. The suit involves a dispute between two restaurant owners over the use of the name "Brennan's." The owner of a widely-renowned New Orleans restaurant named "Brennan's" moved for a preliminary injunction against the owners of a New York City restaurant called "Terrance Brennan's Seafood & Chop House." Plaintiff's motion was denied by the United States District Court for the Southern District of New York (McKenna, J.) in a memorandum and order entered March 20, 2003.

This trademark infringement suit is focused on the protectibility as a mark of plaintiff's use of the family name Brennan. In trademark law names are important identifiers of the source of goods or services marketed to the public consumer.

Names, of course, are not constant like the northern star, but are changeable, as some—like show-business people, some newly married women, and recent immigrants—shed their birth names like old coats and happily don new ones they prefer. But others, like plaintiff and defendant in this case, think their names are treasures to be safeguarded jealously. From the surname Brennan, plaintiff's predecessor coined a trademark he used for his restaurant. Defendant, also named Brennan, attached to that surname his first name of Terrance and used these names as a mark for his restaurant. Thus, the stage for the trademark litigation before us was set.

## BACKGROUND

Plaintiff Brennan's, Inc. (Brennan's New Orleans, plaintiff, or appellant) owns and operates the restaurant "Brennan's," founded in 1946 in New Orleans, Louisiana. Plaintiff registered the name Brennan's pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, as a trademark for its restaurant services. The validity of that mark is not disputed. Plaintiff operates one other restaurant, "Owen Brennan's Restaurant," in Memphis, Tennessee, but owns no restaurants in the New York City area.

Terrance Brennan, so named at birth, is a New York City chef who, prior to this litigation, opened two restaurants in New York City, "Picholine" and "Artisanal." He is a well-known "name" chef whose reputation attracts customers. At the center of this controversy is his newest enterprise, "Terrance Brennan's Seafood & Chop House" (Terrance Brennan's), located in Manhattan. A corporation was formed called 565 Lexington Avenue Co., LLC to own and operate the restaurant. This corporation along with its sole managing member, Brennan's Restaurant, LLC,

are the named defendants in this action. Defendants originally called the new restaurant "Brennan's Seafood & Chop House," but after receiving a cease-and-desist letter from plaintiff's lawyers, they added the first name "Terrance" to their mark.

Brennan's New Orleans sought a preliminary injunction on the grounds that the name Terrance Brennan's Seafood & Chop House infringed its rights in the name Brennan's and was likely to cause consumer confusion. After expedited limited discovery and a two-day hearing, Judge McKenna denied the motion for a preliminary injunction. *See Brennan's, Inc. v. Brennan's Restaurant, LLC,* No. 02–CV9858, 2003 WL 1338681 (S.D.N.Y. Mar.18, 2003). This appeal followed. We affirm.

## DISCUSSION

### I Preliminary Injunction Under the Lanham Act

The Lanham Act creates a cause of action against any person who, in connection with goods or services, uses in commerce

any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the ... connection ... of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, [or] services.....

15 U.S.C. § 1125(a)(1). The key for a plaintiff in proving infringement of its trademark is to show the likelihood of consumer confusion. *See* Restatement (Third) of Unfair Competition § 21 cmt. a (1995) ("The test for infringement is whether the actor's use of a designation as

a trademark ... creates a likelihood of confusion ....").

 A party seeking a preliminary injunction must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). In a trademark infringement case, proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988).

 Although appellant has properly invoked our jurisdiction on an interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1), we must observe that a decision on a motion for a preliminary injunction in a trademark dispute is closely tied to the merits, especially where, as here, the validity of the registered mark is uncontested and the key question is whether there is consumer confusion. By taking an appeal after the denial of a preliminary injunction appellant asks us—with only a limited factual record before us—in effect to decide the merits. Because we review a district court's denial of a preliminary injunction for an abuse of discretion, *see Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 145–46 (2d Cir.2003), it is not surprising that appellant has a formidable hurdle to overcome.

Presumably Brennan's New Orleans seeks expedited review in hopes we will reverse the district court and grant the injunction. Yet, at this early stage, we have before us mostly conclusory allegations supported by facts that are generally contested. Infrequently will such prove to be a record on which an appellate court will find that a district court has abused its discretion by refusing to issue a prelimi-

nary injunction. The only result of an appeal in such circumstances is several months delay. It seems to us that if a party desires rapid resolution of the suit, after its motion for a preliminary injunction has been denied, better practice would be to seek an expedited trial on the merits. With the parties then able to create a more substantial record, the district court would have an opportunity to make more extensive and reliable findings of fact and we would be in a better position to engage in meaningful appellate review.

 Plaintiff also brought dilution and state law unfair competition claims in the district court, but the only issue before us on appeal is the trademark infringement claim. On that issue, the district court ruled that plaintiff had not demonstrated a likelihood of success on the merits. In particular, it noted the minimal evidence of actual confusion, the use of Terrance Brennan's first name in his mark, the sophistication of the relevant consumer market, and the substantial geographic distance—more than 1,000 miles—separating the two Brennan restaurants. Although we are doubtful about certain aspects of the district court's findings, we are at the same time persuaded that Judge McKenna's ultimate determination that plaintiff was not entitled to a preliminary injunction did not constitute an abuse of his discretion.

## II Trademark Infringement

 Plaintiff's claim of trademark infringement is brought under the federal trademark laws, 15 U.S.C. §§ 1114 (imitation of registered mark) and 1125(a) (false designation of origin). To prevail on a claim of trademark infringement, a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion. *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991

F.2d 1072, 1075 (2d Cir.1993); *see, e.g., Virgin,* 335 F.3d at 146 (noting that the *Gruner* test applies to infringement claims brought under §§ 1114 and 1125(a)). The parties do not dispute that plaintiff has a valid, registered mark in the name Brennan's that has become incontestable by operation of law. *See* 15 U.S.C. § 1065. We turn therefore to consider the pivotal question: the likelihood of confusion.

▪ To evaluate the likelihood of consumer confusion, we apply the multi-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961). This test requires analysis of several non-exclusive factors, including: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) actual confusion, (5) the likelihood the plaintiff will bridge the gap, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir.1987) (citing *Polaroid,* 287 F.2d at 495); *Gruner,* 991 F.2d at 1077. No single factor is dispositive, nor is a court limited to consideration of only these factors. *Polaroid,* 287 F.2d at 495. Further, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986).

▪ In reviewing the district court's evaluation of the *Polaroid* factors, each individual factor is reviewed under a clearly erroneous standard, but the ultimate determination of the likelihood of confusion is a legal issue subject to *de novo* review. *Hasbro,* 858 F.2d at 75–76; *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 490 (2d Cir.1988).

The district court's findings with respect to each factor were as follows: (1) plaintiff has a strong mark; (2) the marks are similar, but Terrance Brennan's use of the first name "Terrance" in its mark reduces their similarity and reduces potential confusion; (3) the competing restaurants are not proximate competitors since they are more than 1,000 miles apart; (4) there is no indication that Brennan's New Orleans has any intention of bridging the gap by operating in or near New York City; (5) there is little or no evidence of actual confusion; (6) diners in the high-end restaurants tend to be sophisticated, and thus less likely to be confused; (7) there is no evidence of bad faith on the part of defendants; and (8) the high quality of Terrance Brennan's restaurant is not likely to diminish the reputation of Brennan's New Orleans. The district court concluded that the first factor favored plaintiff, the second partially favored plaintiff, and the remaining factors favored defendant. Accordingly, it refused to grant an injunction.

We find no clear error in most of the district court's findings, and we share its view that plaintiff has not at this point demonstrated a likelihood of confusion. We think, however, that three of the *Polaroid* factors warrant further discussion: the strength of plaintiff's mark, the degree of similarity of the two marks, and the proximity of the services.

### III *Polaroid* Factors

#### A. *Strength of the Mark*

▪ The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir. 2001). There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired

in the marketplace. *See Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743–44 (2d Cir.1998). The former, inherent distinctiveness, examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so. The latter, acquired distinctiveness, refers to something entirely different. This measure looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services. *See TCPIP Holding Co. v. Haar Communications, Inc.*, 244 F.3d 88, 97 (2d Cir.2001).

### 1. *Inherent Distinctiveness of Family Names*

■ Courts assess inherent distinctiveness by classifying a mark in one of four categories arranged in increasing order of inherent distinctiveness: (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary. *Streetwise*, 159 F.3d at 744; *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir.1997). A proper name such as Brennan's is descriptive because it does not by itself identify a product; however, if a name develops secondary meaning, it may come to identify a product as originating from a single source. *See Gruner*, 991 F.2d at 1076; 4 Callmann on Unfair Competition, Trademarks and Monopolies § 22:42 (4th ed. 2003) ("An individual name is rather similar to a descriptive word, in the sense that it might properly be regarded as a convenient description of the fact that the named individual is or was affiliated with the firm."). The name of a person, therefore, like other descriptive marks, is protectible only if it has acquired secondary meaning. *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003).

Of course, a registered mark in continuous use for five consecutive years after registration, and still in use, becomes incontestable. *See* 15 U.S.C. § 1065. Because of this statutory incontestability, Brennan's New Orleans, which would ordinarily be accorded only minimal protection as a descriptive mark, in the district court's view became a strong mark entitled to protection under the Lanham Act. *See Gruner*, 991 F.2d at 1076–77. This statutory incontestability was bolstered by the district court's finding that plaintiff's mark had acquired secondary meaning through its long history and numerous media reviews.

■ In the case at hand plaintiff and defendant have a common last name. And, it is one they share with many others. We take judicial notice that a current Manhattan telephone book lists 184 residences and 20 businesses with the name Brennan. Because the thrust of trademark law aims to avoid confusion as to the product's source it is unhelpful to draw rigid rules when dealing with a common last name. For our purposes in deciding this appeal, for example, it would be incorrect to insist that defendant is always entitled to use his own name in business, and it is equally incorrect to maintain that defendant is never entitled to the use of his own name to compete with the same and perhaps more famous business name of plaintiff.

While the law recognizes the unfairness of letting one person trade on the reputation or the name of another, at the same time it also recognizes that one's surname given at birth creates associations attached to that name which identify the individual. As a consequence, courts generally are hesitant to afford strong protection to proper names, since to do so preempts others with the same name from trading on their own reputation. "To prevent all use of [a man's personal name] is to take away his identity; without it he cannot

make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can." *Societe Vinicole de Champagne v. Mumm*, 143 F.2d 240, 241 (2d Cir.1944) (per curiam). *Cf. Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735–36 (2d Cir. 1978); *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1515 n. 9 (11th Cir.1984).

■ As a common last name, we think at this point and contrary to the district court that plaintiff's mark is inherently weak. *Cf. Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225, 1231 (3d Cir.1978) ("Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection."). A common last name implicates both the minimal level of protection traditionally granted to descriptive marks and the policy of not protecting last names to a degree that unnecessarily precludes other users from trading on their own names' reputation. Further, the more common a last name is, the lower the likelihood that a competitor will effectively appropriate the goodwill of the senior user since consumers will be unlikely to assume that the two brands with the same name refer to the same goods.

### 2. *Plaintiff Has Not Acquired Distinctiveness in New York*

■ Nevertheless, even a common name mark may warrant protection as a strong mark if it has achieved distinctiveness in the marketplace, the second component of a mark's strength. Yet, to achieve the status of a strong mark, plaintiff must demonstrate distinctiveness in the *relevant* market, for if the mark is not recognized by the relevant consumer group, a similar mark will not deceive those consumers and thereby increase search costs. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d Cir.1959); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26:25 at 39 (4th ed.2003). In this case, the relevant market is the pool of actual and potential customers of Terrance Brennan's, for it is those patrons whose potential confusion is at issue.

To support its conclusion that plaintiff's mark was strong, the district court cited media notices regarding Brennan's New Orleans from various newspapers around the country, and observed that Brennan's New Orleans "has had almost two million customers and generated over $84 million in revenues, spending more than $4,600,000 on advertising and promotion." *Brennan's, Inc.*, 2003 WL 1338681, at *2 n. 4. While media and advertising figures are relevant to the analysis, the district court made no findings with respect to advertising expenditures or media exposure in New York City.

We do not doubt that Brennan's New Orleans's history is notable. But virtually all the articles and reviews discuss Brennan's New Orleans in the context of the City of New Orleans or a trip to New Orleans. This evidence in no way demonstrates that potential diners *in New York City* who find the word Brennan's on a restaurant awning will have any reason to think the restaurant is connected with Brennan's New Orleans, or even will have heard of Brennan's New Orleans. This is especially true because Brennan's New Orleans has not expanded in or near New York, defendant Terrance Brennan has his own reputation in New York, and Brennan is a common name.

We recognize, of course, that some last names do achieve such a degree of secondary meaning that they can become strong identifiers of source (*e.g.*, Bacardi for rum, Ford for automobiles, Smucker for jam).

Considering however the importance of permitting a person's good faith use of his own name, courts have taken great care to ensure that injunctions are no broader than necessary to preserve the senior user's rights. To enjoin Terrance Brennan's use of his own name, Brennan's New Orleans must make a showing that its mark has achieved such potency in Terrance Brennan's market that his use of his own name will cause consumer confusion as to source.

The current record suggests to us at most that plaintiff has a strong mark among New Orleans diners and visitors to New Orleans. "However, the fact that a mark has selling power in a limited geographical or commercial area does not endow it with a secondary meaning for the public generally." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989); *see also Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 121 (8th Cir.1987); *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1219 (8th Cir.1976).

Absent from the district court's analysis was any demonstration of acquired distinctiveness in the relevant market, namely the actual and potential New York City diners of Terrance Brennan's. Because the district court's legal analysis on this matter was insufficient, its findings do not at present support the conclusion that plaintiff has a strong mark. The district court may want to revisit this issue at trial in light of further proof it may have before it.

### B. *Similarity of the Marks*

When evaluating the similarity of marks, courts consider the overall impression created by a mark. Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar. *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir.1984). The fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion. *See Gruner*, 991 F.2d at 1078.

We agree with the district court that the addition of the first name "Terrance" to defendant's mark is meaningful. Judge McKenna found that Terrance Brennan, through his restaurants Picholine and Artisanal, has become a well-known chef in Manhattan, and that the use of his first name suggests a restaurant connected with the Terrance Brennan of Picholine and Artisanal instead of a restaurant connected with Brennan's in New Orleans. *Brennan's, Inc.*, 2003 WL 1338681, at *2. This finding is not clearly erroneous.

Because the ultimate issue is the likelihood of confusion, analysis focuses on the particular industry where the marks compete. This is relevant because likelihood of confusion is related to consumer expectations. *See TCPIP*, 244 F.3d at 101. In the restaurant industry, it is not uncommon to name a restaurant after its chef, particularly with high-end restaurants where that chef has developed a reputation in the public's mind. Instances would be: Nobu/Matsuhisa (New York/Los Angeles), Charlie Trotter's (Chicago), Daniel/Café Boulud (New York), Jean Georges (New York), Hamersley's Bistro (Boston), Morimoto (Philadelphia), and Emeril's (multiple locations). These examples suggest the awareness diners have when connecting the name of a restaurant to a particular chef. They also suggest the importance of permitting a chef to use his own name, since forcing a junior user to change his mark imposes costs that may be substantial in the high-class restaurant business.

Plaintiff is concerned that the name Terrance Brennan's Seafood & Chop House will, in practice, simply be truncated to Brennan's in daily use. The district court found that on several occasions, people answering the telephone at Terrance Brennan's identified the restaurant as Brennan's Seafood and Chop House or simply Brennan's. But the court credited Terrance Brennan's testimony that he has since instructed his staff that the first name Terrance is always to be used. Whether and to what extent the practice of truncation may play a role in increasing consumer confusion need not concern us here because plaintiff has not demonstrated that any truncation in this case is of a confusing nature.

### C. *Proximity of the Products*

■ The proximity inquiry asks to what extent the two products compete with each other. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). In assessing product proximity we look at "the nature of the products themselves and the structure of the relevant market." *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir.1981).

■ The competitive proximity factor has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion. In the instant case the services have close market proximity since both are upscale restaurants. The district court found that the two restaurants would, without question, compete for customers were they in the same city. *Brennan's, Inc.*, 2003 WL 1338681, at *3. The court also recognized

the significance of the fact that the restaurants are geographically distant, with more than 1,000 miles separating them.

It is well established that a geographically remote mark may nevertheless gain protection in a distant market, at least where there is extensive advertising or evidence of strong reputation in the distant market. *See, e.g., Stork Rest. v. Sahati*, 166 F.2d 348 (9th Cir.1948) (recognizing that the Stork Club in New York had sufficient nationwide reputation that a new tavern in San Francisco of the same name infringed its mark); 4 *McCarthy on Trademarks, supra*, § 26:17 at 26–27. Although registration presumptively creates nationwide protection, the Lanham Act only permits an injunction against a party where that party's use of a similar mark is likely to cause confusion. *See* 15 U.S.C. § 1114.

We agree with the district court that geographic remoteness is critical in this case. In the restaurant industry, especially where individual restaurants rather than chains are competing, physical separation seems particularly significant to the inquiry into consumer confusion. Even in this age of rapid communication and travel, plaintiff faces a high hurdle to demonstrate that a single restaurant in New Orleans and a single restaurant in New York City compete for the same customers. That is particularly the case here where the dining services require a customer's physical presence and cannot rely, for instance, on Internet or mail-order sales.

■ To succeed on an infringement claim, plaintiff must show that it is probable, not just possible, that consumers will be confused. *See Streetwise*, 159 F.3d at 743. The district court concluded that, even crediting plaintiff's contention that over seven percent of its business comes from New York State, the substantial dis-

tance between the restaurants coupled with the fact that plaintiff has never had an establishment in New York City meant it was unlikely that an appreciable number of ordinarily prudent purchasers were likely to be confused.

Geography is relevant to our analysis of a mark's strength, particularly with marks requiring secondary meaning. Likewise, strength analysis can inform proximity analysis, for the more arbitrary or fanciful a mark, the more likely that geographically distant customers with knowledge of the senior mark might presume that two similar marks are related. With a common last name, we consider it less likely that consumers in a distant market would be surprised to find two unrelated entities using the same common last name.

Certain businesses such as hotels, and to a lesser degree restaurants, attract the traveling public. Courts have recognized that even businesses that are separated by large distances may attract overlapping clientele due to the ease of travel. *See, e.g., Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir.1965) (geographic separation is not dispositive if the nature of the business, *e.g.*, hotels, is such that it attracts the traveling public). We do not disagree with this possibility, but only note that, in the absence of actual confusion or bad faith, substantial geographic separation remains a significant indicator that the likelihood of confusion is slight. *See Dawn Donut*, 267 F.2d at 364 (where use of marks by registrant and new user are confined to distinct and geographically separate markets, and no likelihood that registrant will expand into junior user's market, registrant not entitled to enjoin junior user's use of the mark); *John R. Thompson Co. v. Holloway*, 366 F.2d 108, 114 (5th Cir.1966) ("Where the unauthorized use of a conflicting mark is confined to a distinct and geographically sepa-

rate market by the junior user, there may be no present likelihood of public confusion."). Geography alone is not decisive, but the plaintiff still has the burden to demonstrate that an appreciable number of relevant consumers are likely to be confused. We find no such demonstration on this record.

As to the remaining *Polaroid* factors, we agree with the district court for substantially the reasons set forth in its memorandum and order. Having failed at this early stage to establish a likelihood of success on the merits, plaintiff is not entitled to a preliminary injunction.

### CONCLUSION

The order denying a preliminary injunction is affirmed.