Richard **BULMAN** and Pinweel, Inc., Plaintiffs,

v.

**2BKCO, INC.,** Defendant.

No. 12 Civ. 4859(RJS).

United States District Court,
S.D. New York.

July 23, 2012.

Andrew Guelfi McCormick and Usher T. Winslett of Winslett Studnicky McCormick & Bomser, New York, NY, for Plaintiffs.

Ira George Greenberg of Edwards Wildman Palmer LLP, New York, NY, Guinevere L. Jobson, Jebediah Wakefield, Patrick Premo, and Songmee L. Connolly of Fenwick & West LLP, Mountain View, CA, for Defendant.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

Plaintiffs Richard Bulman and Pinweel, Inc. bring this action against Defendant 2BKCO, Inc., asserting claims for trademark infringement, false designation of origin, unfair competition, dilution, and a declaratory judgment. Now

before the Court is Plaintiffs' motion for a preliminary injunction in connection with Plaintiffs' word mark "Pinweel" and corresponding logo. For the reasons that follow, the Court grants Plaintiffs' motion.

## I. BACKGROUND [1]

Plaintiffs Richard Bulman ("Bulman") and Pinweel, Inc. ("Pinweel") are the owner and authorized user, respectively, of the word mark "PINWEEL" and a related multi colored pinwheel logo (collectively, the "Pinweel Marks"), used in connection with a group photo-sharing and social networking mobile-phone application, or "app," which is software designed to be used on mobile phones. (Compl. ¶ 2.) Plaintiffs' app allows users to upload photos, view albums, post comments, and share content with other users, and is available for download via the iTunes App Store. (*Id.* ¶¶ 16–17.) Bulman began developing Pinweel in 2008. (*Id.* ¶ 10.) Soon thereafter, he purchased the domain *www. pinweel.com* and corresponded with venture capitalists in the hope of securing early-stage capital for the business. (*Id.* ¶ 11.) On March 12, 2011, Bulman filed an intent-to-use application with the United States Patent and Trademark Office ("USPTO") for the Pinweel word mark, and the USPTO issued a certificate of registration for the word mark on June 12, 2012. (*Id.* ¶ 14; Decl. of Richard Bulman, dated June 20, 2012, Doc. No. 10 ("Bulman Decl."), Ex. 4.)

Throughout 2011, Plaintiffs made and distributed promotional materials with the Pinweel marks and continued to test the Pinweel app with limited audiences in preparation for launching the app to the public through the iTunes App Store. (*Id.* ¶¶ 15, 16.) On November 3, 2011, Apple approved the Pinweel iPhone app for release in the iTunes App Store and the Pinweel app became available for download by the public on November 17, 2011. (*Id.* ¶¶ 16, 17.)

Defendant 2BKCo, Inc. ("Defendant") is the owner of the website called PIN-WHEEL, located at www.pinwheel.com. (*Id.* ¶ 21.) Pinwheel was started by Caterina Fake ("Fake"), who is well-known in the tech start-up world as a co-founder of Flickr, a web-based photosharing company, and Hunch, a recommendation service. (*Id.*) Defendant characterizes Pinwheel as a "map-based notes program accessible via the internet, where members leave public or private messages tied to locations around the world using *pinwheel.com*'s unique world map user interface." (Def. Br. at 3.) Pinwheel.com allows members to upload photos, and Fake has described Pinwheel as "Flickr for places." (Compl. ¶ 23; Def. Br. at 12.) Pinwheel announced its product to the public and launched its services in "private beta" on February 16, 2012. (Compl. ¶ 22.) Prior to the February 16, 2012 beta launch announcement, Defendant identified its new service by the name "Knotes." (*Id.* ¶ 24.) However, at some point in the weeks leading up to the public announcement, Defendant acquired the domain name www.pinwheel.com and changed the name of the new service to "Pinwheel." (*Id.* ¶¶ 24–25.)

On February 18, 2012—two days after Pinwheel's public announcement—Plaintiffs sent a cease-and-desist letter to Defendant and Fake regarding the launch of Pinwheel and the use of the Pinwheel mark, requesting that Defendant "immediately cease from any use [it was] currently making of the mark PINWHEEL and

---

**1.** The following facts are taken from the Complaint, the parties' memoranda of law, declarations, and exhibits attached thereto.

abandon any intention [it had] to use such mark in connection with [its] current business concept." (*Id.* ¶ 27; Bulman Decl., Ex. 20.) Although the parties initially attempted to resolve the dispute out of court, these discussions apparently faltered and no understanding between the parties was reached. (Compl. ¶ 30.)

Several instances of confusion between the parties' products followed the launch of Pinwheel. News articles covering the launch of Pinwheel highlighted potential confusion in the marketplace, given the existence of Pinweel.[2] (*Id.* ¶¶ 31–32.) Journalists attempted to contact Fake by emailing the Pinweel website, and at least one venture capitalist seeking to invest in Pinwheel confused the two products and parties, and contacted Pinweel by mistake. (*Id.* ¶¶ 35, 33–34.) Additionally, several Pinwheel customers have downloaded the Pinweel app from the iTunes App Store, thinking that it was connected to Defendant's service—which does not yet have a corresponding app—and became confused, and in some cases angry, when their Pinwheel login information did not work with Plaintiffs' Pinweel app. (*See id.* ¶ 36–37.)[3]

Defendant is currently expanding its user base, which already has tens of thousands of users, and has announced that it hired developers to create iPhone and Android apps. (*Id.* ¶ 39.) Plaintiffs bring this motion for a preliminary injunction because they are concerned that "the recent expansion of the user base of Fake's Pinwheel service, together with the immi-

nent release of [Pinwheel's] iPhone and Android applications are causing and will continue to cause plaintiffs irreparable harm." (Pl. Br. at 17–18.)

## II. LEGAL STANDARD

■■■ A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20, 129 S.Ct. 365; *accord Salinger v. Colting,* 607 F.3d 68, 79–80 (2d Cir.2010). The party seeking the injunction carries the burden of persuasion to demonstrate "by a clear showing" that the necessary elements are satisfied. *See Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## III. DISCUSSION

Plaintiffs have asserted claims for (1) trademark infringement of the Pinweel Marks under Section 43(a) of the Lanham Act; (2) trademark infringement of the registered PINWEEL mark under Section 32(1)(a) of the Lanham Act; (3) a declaratory judgment that Defendant's use and imminent and intended use of the Pinwheel word mark and/or related Pinwheel logo would constitute infringement of Plaintiffs' rights under Sections 43(a)

---

**2.** Defendant claims that Plaintiffs emailed reporters themselves, "incorrectly claiming *pinwheel.com* was also a photo-sharing website." (Def. Br. at 5; Decl. of Caterina Fake, dated June 28, 2012, Doc. No. 19 ("Fake Decl."), ¶¶ 19–20.) Plaintiffs dispute this allegation.

**3.** Plaintiffs highlight a Twitter "conversation" between one such customer and Defendant, in which the confused customer had download-

ed Plaintiffs' Pinweel app and contacted Defendant Pinwheel via Twitter when he could not log in with his Pinwheel information. (Compl. ¶ 37.) When he noticed the different spelling, he tweeted, "That's not wheel its weel; these guys are ripping you off." (*Id.*) However in a subsequent post, the customer stated, "Reading about it they were first! you need to sort that out its very confusing." (*Id.*)

and/or 32(1)(a) of the Lanham Act; (4) common law trademark infringement and unfair competition; and (5) dilution under New York law, N.Y.G.B.L. § 360–L. Defendant insists that Plaintiffs cannot satisfy the necessary elements to obtain a preliminary injunction, focusing on Plaintiffs' purported failure to demonstrate likelihood of success on the merits and irreparable harm.

A. Likelihood of Success on the Merits[4]

■ Section 43(a) of the Lanham Act provides a right of action against "[a]ny person who, on or in connection with any goods or services, uses in commerce any word, term, name, symbol, or device" that "is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1); *New York City Triathlon LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 313 (S.D.N.Y.2010). Section 43(a) protects both registered and unregistered marks. *New York City Triathlon*, 704 F.Supp.2d at n. 1. To state a claim for trademark infringement under Section 43(a), a plaintiff must show that (1) it has a valid mark entitled to protection, and (2) defendant's mark is likely to cause consumer confusion in the marketplace. *Id.* at 314.

With regard to the first element, a certificate of registration of a mark is prima facie evidence of the validity of the mark and of the owner's exclusive right to use the registered mark in connection with the goods or services specified in the certificate. 15 U.S.C. § 1057(b). As discussed, Plaintiffs registered the Pinweel Marks in March 2011, and Plaintiffs have used the Pinweel Marks in connection with their app and services since November 2011.

Defendant does not dispute that the Pinweel Marks are entitled to protection. Rather, Defendant focuses on the second element—likelihood of confusion in the marketplace—and argues that Plaintiffs have not met their burden.

■ In assessing likelihood of customer confusion in the marketplace, district courts must apply the multi-factor test articulated by the Second Circuit in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir.1961). This test requires analysis of several nonexclusive factors, including: (1) the strength of the senior user's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) the junior user's good faith in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of buyers. *Id.* at 495. In assessing the *Polaroid* factors, "[e]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 130 (2d Cir.2004) (quotation marks and citation omitted).

### 1. Strength of the Marks

■ Although the parties dispute the strength of Plaintiffs' marks, the Court finds that the marks are sufficiently strong to tilt this factor in favor of Plaintiffs. The strength of a mark "depends ultimately on its distinctiveness . . . in the eyes of the purchasing public." *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983) (quotation marks and citation omitted). To assess the distinctiveness

---

**4.** The Court focuses on Plaintiffs' claim under Section 43(a) of the Lanham Act with regard to likelihood of success on the merits.

and protectability of marks, courts have developed a sliding scale of categories that are entitled to increasing protection under the law. These five categories—from weakest to strongest—are (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *See, e.g., Gameologist Group, LLC v. Scientific Games Int'l Inc.,* 838 F.Supp.2d 141, 154 (S.D.N.Y.2011). While suggestive, arbitrary, and fanciful marks are presumptively protectable, a mark that is merely descriptive is protectable only with evidence of secondary meaning. *Id.*

 "Descriptive marks are those consisting of words identifying qualities of the product." *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 385 (2d Cir.2005). "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception." *Id.* (quotation marks and citations omitted). "Arbitrary ... marks are ones that do not communicate any information about the product either directly or by suggestions." *Id.*

Plaintiffs argue that because nothing about "pinweel" describes or suggests a photo-sharing application or service, the mark is "arbitrary," or at the very least, "suggestive," since the mark might convey some sense of the attributes of the product, but require imagination and thought for the consumer to make the connection. (Pl. Br. at 21–22.) Accordingly, Plaintiffs insist that the Pinweel Marks are strong, and deserving of protection.

Defendant disagrees, and argues that the Pinweel Marks are merely "descriptive," and therefore must have acquired a "second meaning" in order to be protectable. *See Marks Org., Inc. v. Joles,* 784 F.Supp.2d 322, 329 (S.D.N.Y.2011). Thus, Defendant contends that the Court must also assess the Pinweel Marks' "acquired distinctiveness," which "looks solely to that recognition plaintiffs mark has earned in the marketplace as a designator of plaintiff's goods or services." *Brennan's,* 360 F.3d at 131. To make this assessment, courts consider advertising and promotional expenses, consumer studies linking the mark to the source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use. *See Gameologist Group,* 838 F.Supp.2d at 154 (citations omitted). As Defendants point out, Plaintiffs have alleged generally that they used promotional materials, but have provided no specifics. (Compl. ¶ 15.) Likewise, Plaintiffs have provided no consumer studies and only limited examples of press coverage.[5] Furthermore, Defendant contends that the strength of Plaintiffs' Pinweel Marks is undermined by the common use of pinwheel marks and/or logos by third parties, even in connection with mobile apps.

The Court agrees with Plaintiffs that the Pinweel Marks are "arbitrary," or at the very least "suggestive." *See Gameologist Group,* 838 F.Supp.2d at 154. Thus, Plaintiffs have, at this point in the litigation, presented sufficient evidence for the Court to conclude the Pinweel Marks are eligible for protection without proof of secondary meaning.[6] *See id.* at 154–55. Accordingly, this *Polaroid* factor favors Plaintiffs.

---

**5.** Defendant also suggests that "any press coverage was solicited by [Plaintiffs] in connection with Defendant's launch." (Def. Br. at 8.) Plaintiffs vigorously dispute this contention. (Pl. Reply at 1.)

**6.** Even if the Court agreed with Defendant that the Pinweel Marks are merely "descriptive," this *Polaroid* factor would still favor Plaintiffs. While it is true that Plaintiffs have not supplied evidence related to the "acquired distinctiveness" of their marks, Defendant has

### 2. Similarity Between Marks

 To assess the similarity between marks, courts must consider the context in which the mark is found. *Star Indus., Inc.*, 412 F.3d at 386. Not surprisingly, the marks must be compared against each other to assess whether the similarities are likely to cause customer confusion. *Brennan's*, 360 F.3d at 133. Here, the parties do not dispute that "Pinweel" and "Pinwheel" are "similar in pronunciation." (Def. Br. at 9.) However, Defendant argues that "the overall impression created by the two marks, when viewed in the marketplace, is significantly different," because Plaintiffs' chose a "fanciful misspelling," to create an impression distinct from the commonly used mark "pinwheel." (*Id.*) This argument defies common sense. The pronunciation of the word marks is identical, despite Plaintiffs' "fanciful misspelling," and a casual observer may not even note the misspelling.

Defendant's argument that the stylized pinwheel logos employed by the parties are materially different is likewise weak—clearly, the logos are very similar, despite the subtle differences in colors and design:

(Plaintiffs)

**PINWEEL**

(2BKCo)

**PINWHEEL**

(*See* Pl. Reply at 3 (visual representation of the two marks).)

Defendant also argues that consumers are not likely to encounter the parties' marks in the same search because Defendant's service is web-based, whereas Plaintiffs rely primarily on their app sold through the iTunes App Store. However, Defendant's assertion that internet websites should be deemed wholly distinct and segregated from mobile apps is implausible, especially given Defendant's intent to eventually develop and release a companion Pinwheel app.

Clearly, Plaintiffs have established the similarity between the marks, and accord-ingly, this *Polaroid* factor strongly favors Plaintiffs.

### 3. Competitive Proximity

 "The closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enter., Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir.2003). In assessing product proximity, courts look at "the nature of the products themselves and the structure of the relevant market," *Brennan's*, 360 F.3d at 134 (quotation marks and citation omitted), considering whether the products differ in content, geographic distribution, market position, and audience appeal,

---

not presented sufficient evidence to rebut the presumption of protectability that arises when a mark is registered. *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F.Supp.2d 389, 394 (S.D.N.Y.1998) ("A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.*,

protectible).... As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectibility by a preponderance of the evidence." (citations omitted)).

*W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) (superseded on other grounds).

The similarity between the products is disputed hotly by the parties. Throughout its papers, Defendant characterizes its product as a "map-based program for leaving *notes* around the world" (Def. Br. at 11) (emphasis in original), targeted to businesses and "computer savvy users" (*id.* at 18). Defendant states that the program has no photo album functionality, whereas Plaintiffs' product is exclusively a "group photo sharing service," whose target users are individual consumers. (*Id.* at 11.) Defendant contends that even when the Pinwheel app is launched, it will still maintain its content-sharing website, while Plaintiffs' service is available exclusively through its app and uses its website only as a promotional tool for the app. (*See id.* at 11–12.) Defendant adds that, although both products allow users to share content, this capability alone is "too broad and abstract a classification to reflect marketplace reality, and there is no evidence that consumers would believe they are related." (*Id.* at 12.)

Plaintiffs vigorously dispute Defendant's characterization of its product and its efforts to distinguish Pinwheel from Pinweel. Plaintiffs note that prior to commencement of this action, Fake described Pinwheel as "Flickr for places." (Compl. ¶ 23.) Plaintiffs also point out that numerous technology journalists covering Defendant's launch describe Pinwheel as a photo-sharing service, that Fake submitted a sworn statement to the USPTO describing Pinwheel's goods and services in a manner that is identical to Plaintiffs' services, and that the vast majority of "notes" left on Pinwheel are photos. (*See* Pl. Reply at 4.) Furthermore, Defendant's effort to separate websites from mobile apps is strained, and Plaintiffs have presented evidence that

consumers believed that the products were related. (*See* Pl. Br. at 15 (describing customers downloading the Pinweel app believing it to be related to Defendant's Pinwheel).)

While the Court recognizes that there are differences between the products at issue, there is also undeniably significant overlap. Fake's characterization of Pinwheel as "Flickr for places" certainly implies that Pinwheel is, at least to some extent, a "photo-sharing website," and there is no dispute that Pinwheel allows members to upload photos to the site. Indeed, at oral argument, Defendant conceded that Pinwheel users have the ability to upload photos and that many users *did* upload photos. (Def. Br. at 4.) Furthermore, there is crossover in audience appeal, as both products appeal to "computer savvy" users who seek to share information, which in many cases are photos. Accordingly, at this point in the litigation, this *Polaroid* factor weighs in favor of Plaintiffs.

4. Likelihood of "Bridging the Gap"

This *Polaroid* factor looks to whether the senior user is likely to enter the junior user's market and whether prospective customers are aware of this intention. *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir.1991). Plaintiffs argue that this is not a key *Polaroid* factor in this case, because the parties' products are so similar and are being offered in the same channels of trade to the same sets of consumers. (Pl. Br. at 26.) Defendant relies on its previously articulated, and strained, distinctions between the two products to insist that Plaintiffs have not demonstrated that they are likely to "bridge the gap" and enter Defendant's market, and that they never communicated any such plan to the consuming public. (Def. Br. at 13.) However, because Defendant has not sufficiently distinguished its

product from Plaintiffs' product, and because the two products are largely operating in the same market, the Court agrees with Plaintiffs that this *Polaroid* factor is not relevant to the Court's analysis.

### 5. Actual Confusion

■ For a finding of trademark infringement, it is not essential to demonstrate actual confusion. *Grotrian v. Steinway & Sons,* 365 F.Supp. 707, 715 (S.D.N.Y.1973), *aff'd,* 523 F.2d 1331 (2d Cir.1975). Nevertheless, "there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Id.* at 715–16.

■ In assessing whether an alleged infringement has resulted in "actual confusion," courts must focus on whether prospective purchaser—and not other industry members or general members of the public—are likely to be deceived. *Becoming Inc. v. Avon Prods., Inc.,* No. 01 Civ. 5863(JSM), 2001 WL 930794, at *8 (S.D.N.Y. Aug. 15, 2001). "A plaintiff asserting trademark infringement typically offers evidence of consumer confusion by way of a well designed consumer survey." *Medici Classics Prod., LLC v. Medici Group, LLC,* 683 F.Supp.2d 304, 312 (S.D.N.Y.2010) (citing *Rush Indus., Inc. v. Garnier LLC,* 496 F.Supp.2d 220, 227 (E.D.N.Y.2007)). "In the absence of surveys, anecdotal evidence can sometimes still be used to show confusion, however it must be more than *de minimis.*" *Id.* (citing *Real News Project, Inc. v. Indep. World Television, Inc.,* No. 06 Civ. 4322(GEL), 2008 WL 2229830, at *17 (S.D.N.Y. May 27, 2008)).

Although Plaintiffs do not present consumer surveys demonstrating actual confusion, they point to several anecdotal examples of confusion. Specifically, Plaintiffs cite to instances in which journalists reporting on Defendant's launch were confused, as well as an instance in which a potential investor was confused. (Compl. ¶¶ 31–35.) Furthermore, Plaintiffs offer examples of Defendant's Pinwheel customers downloading Plaintiffs' Pinweel app, and then contacting Plaintiffs with questions and frustrations when they could not log in to the Pinweel app with their Pinwheel codes. (*Id.* ¶¶ 36–37.)

Defendants argue that the Court should not consider instances of confusion by reporters and the media because, in those instances, there was no *actual* confusion, only reports and opinions about *potential* confusion. (Def. Br. at 14.) Those examples—as well as the example of the potential investor being confused-should likewise be discarded, Defendant argues, because such confusion was not by a consumer. (*Id.*) Additionally, Defendant argues that the Court should disregard Plaintiffs' evidence of actual customer confusion, because the evidence consists of a self-interested declaration, which recites second—or third—hand anecdotes. (*Id.* at 15.) Finally, Defendant argues that even if the instances of customer confusion actually reflected "confusion," those incidents are *de minimis* given that Pinwheel has tens of thousands of members. (*Id.* at 14.)

■ "Trade-mark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Lang,* 949 F.2d at 583 (quotation marks and citation omitted). However, the news articles and media reports, coupled with Plaintiffs' examples of frustrated customers who mistakenly downloaded the Pinweel app, provide sufficient evidence at this early stage of the case for the Court to conclude that "prospective purchasers" are likely confused by the marks at issue. Indeed, this suggests that the potential for confusion reported on in the press has actually occurred among customers. Giv-

en Defendant's rapidly growing customer base, and its recent announcement that it will soon develop and launch an app, further examples of confusion are likely to abound. *Cf. Lane Capital Mgmt., Inc.,* 15 F.Supp.2d at 398–99 (finding likelihood of confusion because "[t]he identical nature of [the parties'] marks, their use in connection with similar services, and the evidence of actual confusion demonstrates that the relevant public likely has been, and will continue to be, confused as to the source of the services associated with the marks"). Accordingly, this factor also favors Plaintiffs.

### 6. Good Faith

Under this factor, courts look to the conduct of the defendant, assessing whether "defendant adopted its mark with the intention of capitalizing on plaintiffs reputation and goodwill and any confusion between his and the senior user's product." *Lang,* 949 F.2d at 583 (quotation marks and citation omitted). "Prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 397 (2d Cir.1995). Additionally, "[g]ood faith can be found if a defendant . . . has requested a trademark search or has relied on the advice of counsel." *Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 964 (2d Cir.1996), (citing *W.W.W. Pharm. Co.,* 984 F.2d at 575).

While Plaintiffs argue that Defendant should have conducted a more thorough trademark availability search prior to adopting the Pinwheel mark, there is no evidence to suggest that Defendant intended to capitalize on Plaintiffs' reputation,

goodwill, or confusion between the products. To the contrary, it appears that Fake is the more prominent player in the industry. Thus, this *Polaroid* factor favors Defendant.[7]

### 7. Quality of Defendant's Product

The quality of Defendant's product is not in dispute. However, as Plaintiffs note, the quality of Defendant's product does not matter, because a senior user "is not required to put its reputation in [a junior user's] hands, no matter how capable those hands may be." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259–60 (2d Cir.1987) (quoting *James Burrough, Ltd. v. Ferrara,* 6 Misc.2d 692, 165 N.Y.S.2d 825, 826 (N.Y.Sup.Ct.1957)). Thus, this factor is largely irrelevant and favors neither Plaintiffs nor Defendant.

### 8. Sophistication of Buyers

In considering the sophistication of the relevant purchasers, courts must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving attention such purchasers usually give in buying that class of goods." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979) (quotation marks and citation omitted) (superseded on other grounds). The more sophisticated the purchasers, the less likely they will be confused by the presence of similar marks in the marketplace. *Savin Corp. v. Savin Group,* 391 F.3d 439, 461 (2d Cir.2004). However, even the most sophisticated of consumers can be confused when the marks and services are very similar. *New York City Triathlon,* 704 F.Supp.2d at 341.

---

**7.** However, the Court notes that "because the ultimate issue is likelihood of confusion, a defendant's good faith alone will not preclude a finding of infringement where such a find-

ing is dictated by the remaining *Polaroid* factors." *Morningside Group Ltd. v. Morningside Capital Group, LLC,* 182 F.3d 133, 142 (2d Cir.1999).

■ Defendant argues that "prospective consumers are sophisticated and can distinguish between a mobile app used for group photo-sharing versus a map-based product that allows them to find and leave notes based on geographic location." (Def. Br. at 19.) However, Defendant does not address the several instances in which real customers did *not* distinguish between Plaintiffs' mobile app and Defendant's website. It is completely reasonable for individual customers—even those who are "sophisticated technology adopters and computer savvy users" (Def. Br. at 18)—to expect a website, such as Pinwheel, to have a corresponding mobile app. Thus, regardless of how sophisticated the relevant consumers are, given the similarities between the marks and the market, it is reasonable to believe that consumers are, and will continue to be, confused. Accordingly, this *Polaroid* factor favors Plaintiffs.

\* \* \*

■ After analyzing the *Polaroid* factors, the Court concludes that Plaintiffs have demonstrated a likelihood of confusion, and therefore a likelihood of success on the merits, of their trademark infringement claim under Section 43(a) of the Lanham Act.

## B. Irreparable Harm

■ "The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Grout Shield Distrib., LLC v. Elio E. Salvo, Inc.*, 824 F.Supp.2d 389, 419 (E.D.N.Y.2011) (quotation marks and citation omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Life Techs. Corp. v. AB Sciex Pte.*, No. 11 Civ. 325(RJH), 2011 WL 1419612, at *4 (S.D.N.Y. Apr. 11, 2011) (citation omitted). Furthermore, a plaintiff must show "that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.* (citation omitted).[8]

■ Although Plaintiffs have not claimed lost business, sales, or revenues, and they do not specifically claim to have experienced fewer user downloads of Pinweel due to Defendant's product, "[p]rospective loss of . . . goodwill alone is sufficient to support a finding of irreparable harm." *New York City Triathlon*, 704 F.Supp.2d at 343 (citing *Tom Doherty Assoc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37–38 (2d Cir.1995)). Plaintiffs' examples of customer frustration and confusion coupled with Defendant's plan to develop and release a Pinwheel app, suggests that future confusion—and accompanying prospective loss of goodwill—is a virtual certainty. *See also Joles*, 784 F.Supp.2d at 335 ("[W]here the likelihood of confusion is so high, it is impossible to disaggregate lost good will from confusion. . . . The extreme likelihood of confusion (as well as evidence of actual confusion) makes it clear that Plaintiff has lost good will because of this confusion.").

Furthermore, although Plaintiffs knew of Defendant's product for several months before bringing the present motion, the Court finds that this delay does not under-

---

8. Plaintiffs note that several courts in this district have continued to follow the pre-*Salinger* rule that a showing of likelihood of confusion in trademark actions was always sufficient to establish irreparable harm. *See, e.g., Coach, Inc. v. O'Brien*, No. 10 Civ. 6071(JPO)(JLC), 2012 WL 1255276, at *17 (S.D.N.Y. Apr. 13, 2012).

cut Plaintiffs' contention that they will suffer irreparable harm in the absence of a preliminary injunction. In the Second Circuit, delay in applying for a preliminary injunction is "one factor to be considered in determining whether a plaintiff will, in fact, suffer irreparable harm in the absence of a preliminary injunction." *New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 Civ. 6433(NRB), 2012 WL 251976, at *10 (S.D.N.Y. Jan. 11, 2012).

Plaintiffs have known since at least February 16, 2012 that Defendant planned to launch beta testing in preparation for making the online Pinwheel product available to the public. (Def. Br. at 22–23.) Defendant alleges that instead of seeking to enjoin Defendant when it first learned of Defendant's plan for Pinwheel, Plaintiffs instead capitalized on the press surrounding Defendant's product. (*Id.* at 23.) However, nothing in the record at this point supports Defendant's allegation that Plaintiffs "capitalized" on Pinwheel's press, and in fact, the record indicates that Plaintiffs sought to resolve the dispute without resorting to litigation. Plaintiffs sent a cease-and-desist letter to Defendant on February 18, 2012, and the parties "agree[d] to talk about the dispute between them." (Pl. Br. at 10–12.) Plaintiffs also attempted to assist Pinwheel customers who mistakenly accessed the Pinweel app, and correct journalists who mistook Plaintiffs' company for Defendant's. (Pl. Reply at 1–2.) Accordingly, the Court concludes that Plaintiffs' delay in bringing this motion does not undercut their allegations of irreparable harm.

Given the potential loss of goodwill and reputation likely to result from Defendant's continued infringement, the Court finds that in this case, Plaintiffs would suffer irreparable harm in the absence of a preliminary injunction.

### C. Balance of Hardships

Plaintiffs argue that the balance of hardships "weighs heavily in plaintiffs' favor," because "actual confusion caused by defendant's use of the infringing marks is causing plaintiffs immediate and irreparable harm," and because Plaintiffs conceived of and began developing the Pinweel Marks and business years prior to Defendant's use of "Pinwheel." (Pl. Br. at 38.) Furthermore, Plaintiffs argue that Defendant could have avoided this situation if it had done proper diligence in selecting its name. *See Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir.1983) ("[O]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." (quotation marks and citation omitted)).

Defendant counters that it would "incur significant loss," including the loss of time and money invested into acquisition of the *pinwheel.com* domain and development and promotion of the product, if a preliminary injunction issued. (Def. Br. at 23.) Defendant also claims that it would suffer damage to *its* goodwill and reputation if an injunction issued. (*Id.*)

Because Plaintiffs were first to develop the product and select the "Pinweel" name, and because Defendant only selected the "Pinwheel" name within the last several months—indeed, Defendant's product is still in its testing phase and has not yet been fully launched—the Court finds that the balance of hardships weighs decidedly in favor of Plaintiffs.

### D. Public Interest

Plaintiffs argue that the "strong public interest in avoiding consumer confusion in the marketplace" counsels towards granting Plaintiffs' motion. Defendant responds that the public interest in "the distribution of a high quality, innovative

product under a brand that tens of thousands of *pinwheel.com* members already know and trust" counsels against granting Plaintiffs' motion. While the Court agrees that the public has an interest in high quality technological products, the quality of a given product is meaningless if the public is confused about which product it is using. Thus, in this case, the public interest is best served by removing confusingly similar marks so that the public can more freely access the parties' products. *See Tecnimed SRL v. Kidz–Med, Inc.*, 763 F.Supp.2d 395, 417 (S.D.N.Y.2011) (specifying that this prong serves the public interest by removing confusing marks from the marketplace).

\* \* \*

Accordingly, because Plaintiffs have demonstrated that they "[are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest," *Winter*, 555 U.S. at 20, 129 S.Ct. 365, the Court grants Plaintiffs' motion for a preliminary injunction.

### F. Posting a Bond

Defendant argues that if the Court finds that Plaintiffs have shown sufficient bases for an injunction, a bond of at least $500,000 would be warranted to "limit the possibility that a restrained party that is ultimately successful on the merits is not able to obtain adequate relief." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F.Supp.2d 525, 541 (S.D.N.Y.2004). Defendant argues that $500,000 includes only the of out-of-pocket losses that Defendant would incur. (Def. Br. at 24–25; Fake Decl. ¶ 35.) However, without more evidence than Fake's conclusory "estimate that being required to change the pinwheel name and logo at this time would cost 2BKCO at least $500,000," (Fake Decl.

¶ 35), the Court cannot conclude that requiring Plaintiffs to post such a bond is warranted. Accordingly, Defendant's request for a bond is denied without prejudice to renewal.

### IV. CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs have demonstrated by a "clear showing" that they have satisfied the elements under the Second Circuit's test for a preliminary injunction. Accordingly, Plaintiffs' motion is GRANTED.

IT IS FURTHER ORDERED that the parties shall jointly submit a proposed case management plan and scheduling order no later than August 6, 2012. A template is available at http://nysd.uscourts.gov/cases/show.php?db=judge_info&id=347.

SO ORDERED.