THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
March 20, 2013

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

*America's Best Franchising, Inc.*

*v.*

*Roger Abbott*

———

Concurrent Use No. 94002407

———

Mark L. Seigel of The Seigel Law Firm LLC for America's Best Franchising.

Paul D. Supnik for Roger Abbott.

———

Before Quinn, Lykos and Adlin, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

America's Best Franchising, Inc. ("applicant" or "ABF") seeks concurrent use

registrations for the marks shown below



---

[1] Application Serial Nos. 77425965, 77425988 and 77425996, with "HOTEL,"
"RESORT" and "HOTELS & RESORTS" disclaimed, respectively.

for "Hotel and motel services." Applicant originally filed each application without geographic restriction on March 19, 2008, and later amended each application to allege first use in commerce on March 26, 2008 and to identify Roger Abbott ("excepted user" or "Abbott") as an exception to applicant's exclusive right to use the marks in commerce. In each application, as amended, ABF now "claims exclusive right to use the mark in the area comprising the entire United States except the state of Arizona," which is where ABF concedes that Abbott uses his mark. On July 9, 2009, following ABF's amendment of the involved applications, the Board instituted this proceeding.[2]

On August 17, 2009, Abbott filed an answer, or "statement," under Trademark Rule 2.99(d)(2), denying that ABF is entitled to concurrent use registrations. More specifically, Abbott claims that he "has adopted and continuously used the service mark 3 PALMS in the United States in connection with the sale of hotel services" since April 30, 2004, through a "related company," 3 Palms Resort Oasis, LLC. Answer ¶¶ 1-3. Abbott admits that "he currently has licensed the 3 PALMS mark in connection with [only] a single hotel located in Scottsdale, Arizona," but denies that he has no plans to expand his use of the mark beyond that single location, specifically asserting that "the Internet marketing, advertising and promotion of hotels by necessity has expanded [Abbott's] territory

---

[2] After applicant's original, geographically unrestricted applications were published for opposition, Abbott filed Opposition Nos. 91186345 and 91188829 against them. Pursuant to the Board's July 9, 2009 order in both proceedings, those opposition proceedings were dismissed without prejudice after applicant amended the involved applications to seek concurrent use registrations and accepted judgment with respect to its right to unrestricted registrations.

nationwide or to something significantly greater than the state of Arizona." *Id.*

¶¶ 10, 17, 18. Finally, Abbott alleges that ABF "knew of or should have known of"

Abbott's use of 3 PALMS prior to adopting its involved marks, and that the parties'

marks are confusingly similar. *Id.* ¶¶ 8, 19.

## **The Record**

The record consists of the pleadings, the files of the involved applications and

the following:

- ABF's Notice of Reliance ("NOR"), filed October 12, 2011 (TTABVue Docket #25), which includes: the transcript of ABF's discovery deposition of Mr. Abbott ("Abbott Disc. Tr."); Abbott's responses to ABF's first set of interrogatories ("Int. Resp."); printouts of Office records of third-party registrations, from the TARR database; printouts from third-party websites; and a copy of an advertisement in the Spring 2010 edition of "The Griffon;"

- Abbott's Notice of Reliance and supplement thereto, filed December 16 and 19, 2011, respectively (TTABVue Docket #s 30, 32 and 34), which include: the transcripts of Abbott's discovery depositions of applicant's chairman, Chief Executive Officer and president Douglas Collins ("Collins Disc. Tr."), applicant's Vice-President and Chief Operating Officer Chip Elbers ("Elbers Disc. Tr.") and applicant's Vice President for development for franchise sales Jason Yarborough ("Yarborough Disc. Tr."), and the exhibits thereto; the file history of Abbott's application Serial No. 77525894, which is not part of this proceeding; applicant's responses to Abbott's first set of interrogatories (ABF's Int. Resp.); applicant's May 8, 2009 motion in Opposition No. 91188829 to amend its involved applications to seek concurrent use registrations, and terminate the opposition in favor of a concurrent use proceeding; and printouts from the "archive.org" website purporting to show how Abbott's website appeared in 2004 and 2006;

- the parties' December 16, 2011 Stipulation (TTABVue Docket # 31), which in its entirety is that: "Roger Abbott began using

> the mark 3 PALMS RESORT OASIS (and Design) in connection with a single hotel located at 7707 E. McDowell Rd., Scottsdale, AZ 85257 in or about April 2004" (the "Stipulation"); and
>
> • the transcripts of the testimonial depositions of Roger Abbott ("Abbott Test. Tr."), Abbott's business manager Linda Condon ("Condon Test. Tr."), Abbott's friends Harry Stylii ("Stylii Test. Tr.") and John Ferry ("Ferry Test. Tr."), Abbott's colleague Roger Sheppard ("Sheppard Test. Tr."), Abbott's former employee and independent contractor Psy John Iverson ("Iverson Test. Tr."), Douglas Collins ("Collins Test. Tr."), Donald "Chip" Elbers ("Elbers Test. Tr.") and Peter Mathon of Mathon & Associates which provides marketing and public relations services for applicant ("Mathon Test. Tr.") and the exhibits thereto.

The parties argue over the weight to be accorded certain evidence, but do not raise any evidentiary objections, which the Board commends as the preferred method for addressing evidence introduced in *inter partes* proceedings.

### The Parties

ABF provides "hotel franchising" and other services to "about 280" hotels in the United States. Collins Disc. Tr. 20:24; Collins Test. Tr. 5:11. ABF's hotel brands include COUNTRY HEARTH INNS & SUITES, AMERICA'S BEST INN & SUITES, PARKSIDE INN & SUITES, BUDGETEL INN & SUITES, VAGABOND INN & SUITES and the here-involved 3 PALMS HOTELS & RESORTS. Collins Test. Tr. 6:1-4. While most of ABF's brands are licensed through franchise agreements, "3 Palms and Parkside are available as service agreements," with 3 PALMS being offered through applicant's wholly-owned subsidiary 3 Palms Inc. *Id.* at 6:9-10; Collins Disc. Tr. at 16-17. In testifying about the differences between ABF's "service agreements" with 3 PALMS hotels and its franchise agreements with

4

hotels operating under applicant's other brands, ABF's CEO testified: "The 3 Palms concept is a service to hotels that require representation on the reservation systems, travel club, quality assurance, purchasing, marketing, that may not be candidates for a traditional franchise due to their ownership or location or physical structure." Collins Test. Tr. at 6:15-21. For example, a "condominium hotel owned by a number of various investors that would not traditionally be able to sign a franchise agreement." *Id.* at 7:3-6. At the time of Mr. Collins's testimony deposition, applicant provided services to eight 3 PALMS hotels in the United States, one each in California, Georgia and South Carolina, and five in Florida. *Id.* at 9. Two of ABF's 3 PALMS hotels have closed or stopped using 3 PALMS, one in Texas and another in Indiana. *Id.* at 11. In addition to the three involved concurrent use applications, ABF also owns an uninvolved, geographically unrestricted application for registration of the following mark



for "Hotel and motel services."[3]

Abbott is the sole owner and manager of Blue Sky Equity Partners, LLC, which in turn is the sole owner of his 3 PALMS hotel in Scottsdale, Arizona. Abbott Test. Tr. at 8, 70; Abbott Disc. Tr. at 10, 155; Abbott's Int. Resp. No. 15. Abbott also owns other hotels operating under different marks. He purchased his first hotel,

---

[3]    Application Serial No. 77529087, filed July 23, 2008, alleging first use dates of June 1, 2008, with "HOTEL" disclaimed.

Big Bear Frontier, in Big Bear California, in 2001, followed by the 3 Peaks Resort and Beach Club in South Lake Tahoe, California, 7 Springs Inn and Suites and Caliente Tropics Hotel, both in Palm Springs, California and, in 2004, the 3 PALMS Hotel in Scottsdale. Abbott Test. Tr. at 9-11; Abbott's Int. Resp. No. 17-18. Abbott no longer owns Big Bear Frontier. *Id.* Abbott also owns BIZX, LLC, a "web media business" which "creates, purchases, and then owns and operates websites and a number of different verticals including travel and telecommunications and other marketplaces," the goal of which is to "optimize" websites so that they "show up in the top of the search engines in Google and Bing and Yahoo, and then we sell advertising on these websites to other hotels and other advertisers." Abbott Test. Tr. at 11-12. Abbott owns an uninvolved, geographically unrestricted application for registration of 3 PALMS, in standard characters, for "hotel services."[4]

Applicant's uninvolved geographically unrestricted application has been suspended pending disposition of Abbott's uninvolved geographically unrestricted application, and Abbott's uninvolved geographically unrestricted application has been suspended pending disposition of applicant's involved concurrent use applications.

### The Parties' Concurrent Use of 3 PALMS, and Third-Parties' Use of PALMS for Hotels

There is no dispute that as between the parties, Abbott was the first to use 3 PALMS, in April 2004 at the Scottsdale location. Stipulation; Abbott's Int. Resp.

---

[4] Application Serial No. 77525894, filed July 18, 2008, alleging first use dates of April 30, 2004.

Nos. 1, 2; Elbers Disc. Tr. at 8-10; ABF's Int. Resp. No. 5. At the time, Abbott's Scottsdale hotel operated under the trade name and service mark 3 PALMS RESORT OASIS, but in 2007 Abbott changed the hotel's trade name and service mark to 3 PALMS HOTEL, "[b]ecause it was too long of a name to say, and people didn't understand what we necessarily meant when we said 'Resort Oasis.'" Abbott Disc. Tr. at 130-131. More specifically, hotel guests complained that the hotel "didn't fall into the category of a resort, and so there were people complaining because maybe they thought there should be lawns or golf courses or whatever, and basically it was a hotel. So we thought the property was better represented by just using the word hotel as opposed to resort." Abbott Test. Tr. at 34:21-35:1.

Abbott has not offered hotel services under 3 PALMS outside of the Scottsdale location, but has made fairly extensive use of the mark on the Internet. While Abbott has designated information regarding his promotional efforts as "highly confidential," and the evidence will therefore only be addressed generally here, suffice it to say that Abbott promotes his 3 PALMS HOTEL via advertisements placed on prominent Internet search engines and travel-related websites, and through listings on various directories accessible online. Abbott Int. Resp. Nos. 7-8. Abbott's advertising expenses appear to be fairly substantial for a single hotel the size of 3 PALMS, which has approximately 135 rooms. Abbott Test. Tr. at 11:3; Condon Test. Tr. at 14-17 and Exs. 103-104.

Abbott's 3 PALMS HOTEL has also received unsolicited media attention. Abbott Test. Tr. at 54-58 and Exs. 106-109. Abbott claims that "[a]pproximately

7

50% of our customers come from outside of Arizona." Abbott's Int. Resp. Nos. 7-8.

Consumers may book rooms at Abbott's 3 PALMS hotels via the Internet. Abbott

Disc. Tr. at 210-216. Abbott testified and introduced evidence that his hotel

sometimes appears on the Internet in proximity to one or more of ABF's 3 PALMS

hotels, and that some of ABF's 3 PALMS hotels have received negative consumer

reviews on tripadvisor.com. Abbott Test. Tr. at 62-69 and Exs. 83, 110-115.

According to Abbott, the Internet is extremely important to his 3 PALMS

hotel and the hotel business generally.

> … it's my view that for the last five, six, ten years, starting 15 years ago, but especially in the last five or six years, that the hotel market, business is done online. For my hotel, for the 3 Palms Hotel, 100 percent of our business comes from online marketing. That means distribution channels like Expedia online, Travelocity, Orbitz, we refer [to] them as extranet partners or distribution partners. Then there's informational websites like Trip Advisor. There's a huge resource in the travel market. So to have your hotel listed on Trip Advisor and to have good reviews is hugely important. Hugely important. Then marketing on other kind of websites like local websites, like Scottsdale.com. national websites like YellowPages.com, SmartPages.com, SuperPages.com, these are all national providers. So if you lived in your home in Florida, for instance, and you wanted to travel to Scottsdale, you might look on Expedia. You might search Google. You might go to SuperPages.com. And typically you're either going to search by name of the property if you've stayed there before and like them or if somebody's mentioned them to you, or you're going to search for the geographic, you might say "Scottsdale hotel." So the other thing is search, where you are in the search engines. So right now, my hotel out there, 3 Palms is usually very high in the search. It's usually number one or two in the organic search, the free search. And then we work very hard to move it up into the organic searches for other sorts of

> terms like "Scottsdale hotel" or "hotel in Scottsdale," you know … In the old days you would have revenue managers that would do all kinds of things, but now that it's all web-centric it has become much more efficient for us to market the hotel and so that's all part of our plan.

Abbott Disc. Tr. at 80-81. The Internet is important not only to Abbott's hotel marketing, but to also his sales. "I would say for us and every other hotel the primary way rooms are sold these days is on the Internet." *Id.* at 221-222.

Abbott claims that since "the later part of 2006" he has intended to expand his use of 3 PALMS to other hotels which he "has identified at various times in connection with his search for hotel properties … though there is no specific location at the present time." Abbott Int. Resp. No. 1. Abbott specifically identified eight hotels "for which offers have been made or where loan commitments have been sought," between January 2007 and September 2009, including two in Arizona, three in New Mexico and three in Southern California. Abbott claims that he "was also considering the possibility of acquiring a hotel in Oregon or the state of Washington." Abbott's Int. Resp. Nos. 1, 3, 4, 5. Over the past "10 to 12 years," Abbott has made approximately 40-50 offers to purchase additional hotels, many of which he intended to rebrand as 3 PALMS hotels. Abbott Test. Tr. at 13-25 and Exs. 76-82.

However, every one of Abbott's 40-50 purchase offers made with the intention of expanding 3 PALMS or other brands was rejected, and despite his apparent attempts to do so, Abbott has not expanded his use of 3 PALMS beyond the Scottsdale physical location. Abbott has not offered to purchase any hotels in states

9

other than Arizona, New Mexico and California. *Id.* at 80:9-13. Abbott has not placed or distributed print advertisements in states other than Arizona, California and Nevada. *Id.* at 81:23-25.

While several of Abbott's written offers to purchase hotels have been introduced into evidence, none of the documents refer to the 3 PALMS mark or Abbott's intentions with respect thereto. Abbott Test. Tr. Exs. 76-82. In fact, Abbott has no documents or written materials explaining or supporting his apparent attempt to expand his use of 3 PALMS beyond his single property in Scottsdale, Arizona. In any event, Abbott's business manager recalled discussions with Abbott concerning his intention to expand his use of 3 PALMS to other hotels. Condon Test. Tr. at 6-9 and 21-22. In addition, Abbott claimed during discovery that he discussed his expansion plans with some of his friends and colleagues, including Roger Sheppard, Harry Stylii and John Ferry, and Messrs. Stylii and Ferry generally recalled at least one discussion with Mr. Abbott regarding plans to expand the 3 PALMS brand, while Mr. Sheppard recalled several discussions with Mr. Abbott concerning Abbott's plans to expand the 3 PALMS brand to additional hotels in Arizona, New Mexico and California. Abbott Disc. Tr. at 109-111; Stylii Test. Tr. at 7, 12-15; Ferry Test. Tr. at 9-10; Sheppard Test. Tr. at 7-14. The witnesses all agreed that as a result of the financial crisis in 2007 and 2008, which limited banks' ability or willingness to lend, Abbott's expansion plans were postponed or "blunted." Abbott Test Tr. at 91-93; Condon Test. Tr. at 9; Stylii Test. Tr. at 10; Ferry Test. Tr. at 9.

10

In 2008, Abbott put the Scottsdale 3 PALMS HOTEL up for sale, due to "issues" between Mr. Abbott and his business partner, in an attempt "to figure out a valuation or to figure out if there was a buyer that liked it." Abbott Disc. Tr. at 120-21; Abbott Test. Tr. at 28-30. If a bidder had met Abbott's asking price, Abbott would have sold the hotel. Abbott Disc. Tr. at 129-30.

Abbott intends for his 3 PALMS brand to identify "full-service" hotels, in that he intends to use the mark for hotels with a bar and restaurant. Abbott Disc. Tr. 104:21-22. More specifically, "I'm waiting to see where this [trademark] battling comes out, but at the end of the day, I would like to wrap everything up into a master brand but then have the specific type of hotel, which is that, what I call taking that lower end box, if you will, and stuffing it full of high-end amenities with a full-service restaurant. That's what I envision being the 3 Palms Hotel brand." *Id.* at 105:15-22. Abbott testified that generally additional 3 PALMS hotels would have more than 100 rooms. Abbott Test. Tr. at 22:16.

ABF began using its 3 PALMS mark in mid-2008 in Central Florida, at the Castle Pines in Port St. Lucie and Palms Hotels & Villas and Destiny Palms Hotels in Kissimmee. Collins Disc. Tr. at 23-32 and Ex. 1. ABF claims that at the time it first started using 3 PALMS, it was unaware of Abbott's hotel or his use of 3 PALMS. ABF's Int. Resp. No. 17; Collins Disc. Tr. at 11-14; Collins Test. Tr. at 11-12; Elbers Disc. Tr. at 10-13; Yarborough Disc. Tr. at 10-12. ABF first learned of Abbott's use of 3 PALMS in "mid June 2008." ABF's Int. Resp. No. 17; Collins Disc. Tr. at 12:24.

11

Thereafter, the following 3 PALMS hotels, each of which has a services agreement with applicant, opened as indicated:

• The Historic Riverboat Inn -- a 3 Palms Hotel, Madison, IN, October 2008

• 3 Palms Oceanfront, Myrtle Beach, SC, March 2009

• The Beverly Hills Inn -- a 3 Palms Hotel, Atlanta, GA, July 2009

• The Beach Plaza – a 3 Palms Hotel, Fort Lauderdale, FL, January 2010

• 3 Palms Hotel, Bay City, MI, mid-2010

• Napa Valley Hotel & Suites, a 3 Palms Hotel, Napa, California, July 2011

ABF's Int. Resp. No. 5; Mathon Test. Tr. Exs. 9, 13; Collins Test. Tr. p. 9, 18; Elbers Test. Tr. p. 26. In addition to the ABF 3 PALMS "client" hotels identified above, ABF provides services to approximately "45 to 50" hotels in California and "3 or 4" hotels in Arizona operating under different brands, but does not provide services to any hotels in Nevada or New Mexico. Collins Disc. Tr. at 20-21.

ABF promotes its services and client 3 PALMS hotels at trade shows, including the Asian-American Hotel Owners Association trade show and the Hotel Operations and Technology show, has received media attention in trade journals, such as *Hotel/Motel Management*, *Lodging & Hospitality*, *Asian Hotel Marketing* and *Hotel Business*, and has advertised in a military magazine, *The Griffon*. Elbers Disc. Tr. at 28-29 and Mathon Test. Tr. Exs. 25, 53-59, 65, 74-75. ABF also markets the 3 PALMS brand through its own website, by assisting its client hotels in setting up their own websites and through a "brand-specific Youtube channel." Elbers Disc. Tr. at 29-30. On a more limited basis, ABF advertises directly to consumers.

Mathon Test. Tr. at 87 and Exs. 71-72. Like Abbott, ABF promotes its 3 PALMS mark on the Internet, and consumers may book reservations at ABF's 3 PALMS hotels via the Internet. Collins Disc. Tr. at 18-20; Elbers Disc. Tr. at 18, 28-30.

ABF's 3 PALMS client hotels are at the "mid-price to upper scale" of ABF's family of hotel brands, and are targeted to "destination" or "resort" locations. Collins Disc. Tr. at 37:2-21; Yarborough Disc.. Tr. at 13:13-14; Elbers Test. Tr. at 26:8-9. The 3 PALMS brand is positioned as "upscale." Elbers Disc. Tr. at 44:18. As Mr. Elbers explained:

> Budget/economy would be – I'm not meaning this in a disparaging way – but would be the Red Carpets of the world. And the ultra-upscale would be the Ritz-Carltons of the world. 3 Palms falls in the upscale category, as it is recognized by Smith Travel Research, which is one of the leading market metric providers in our industry. "Upscale" meaning providing additional services above and beyond what would be considered a mid-scale hotel, "mid-scale" being, I would say, Comfort Suites, Comfort Inn, Hampton. "Upscale" would be a property that might include an on-site restaurant, a fitness center, upscale amenities, meeting space. It would be in a resort or a destination location, a higher-quality property, specifically.

Elbers Test. Tr.. at 25:7-24.

Neither party is aware of any actual confusion between their respective 3 PALMS marks. Collins Test. Tr. at 15-16; Elbers Disc. Tr. at 14:9; Elbers Test. Tr. at 28-29; Yarborough Disc. Tr. at 15-16; Abbott Test. Tr. at 87-88.

ABF introduced evidence that PALMS is commonly registered, and commonly used, for hotels. Among others, the following marks are used on the Internet and federally registered for hotels and/or hotel-related services such as rental, booking

13

and reservation services: PALMS, LITTLE PALM ISLAND, MAYA PALMS RESORT, OCEANA PALMS, PACIFIC PALMS CONFERENCE RESORT, ROYALE PALMS, WILD PALMS HOTEL, TEMPE MISSION PALMS,

 and .

ABF's NOR Tabs 3-39. Among others, the following marks are used, at least on the Internet, for hotels: COLONY PALMS Hotel, DESERT PALMS, GAYLORD PALMS RESORT & CONVENTION CENTER, ROYAL PALMS, ROYAL PALM, RIVER PALMS, THE PALMS HOTEL & SPA, THE PALMS HOTEL, THE PALMS OF DESTIN,

 and . *Id.*

### Analysis

Concurrent use proceedings are governed by the following proviso of 15 U.S.C. § 1052(d):

> … if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of the concurrent lawful use in

14

> commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this chapter …

In other words, there are two "conditions precedent to the issuance of concurrent registrations," specifically that: (1) "the parties be presently entitled to concurrently use the mark in commerce;" and (2) "there be no likelihood of confusion, mistake or deception in the market place as to the source of the goods resulting from the continued concurrent use of the trademark." *In re Beatrice Foods Co.*, 429 F.2d 466, 166 USPQ 431, 435-36 (CCPA 1970). *See also, Action Temporary Services, Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989) ("A valid application cannot be filed at all for registration of a mark without 'lawful use in commerce,' and, where a claim is made of concurrent rights, such use must begin prior to the filing date of any application by a conflicting claimant to the mark.") (citation omitted); *Over the Rainbow, Ltd. v. Over the Rainbow, Inc.* 227 USPQ 879, 882 (TTAB 1985).

The applicant is the plaintiff in a concurrent use proceeding, and "has the burden of proof of demonstrating its entitlement to a concurrent use registration." *Over the Rainbow,* 227 USPQ at 883. *See also, Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 3 USPQ2d 1306, 1308-09 (Fed. Cir. 1987) (concurrent use plaintiff "was not 'entitled' to [a concurrent use] registration unless he also satisfied the 'touchstone' requirement of no likelihood of confusion with [the defendant's] use"); Trademark Rule 2.99(e). In a concurrent use registration, the "conditions and limitations as to the mode or place of" use almost always take the form of a

15

"geographic restriction," especially where the Board, rather than a court, approves registration based on evidence regarding the actual "conditions and limitations." *See Holmes Oil Co., Inc. v. Myers Cruizers of Mena, Inc.*, 101 USPQ2d 1148, 1149 (TTAB 2011); *The Tamarkin Co. v. Seaway Food Town Inc.*, 34 USPQ2d 1587, 1590 n.4 (TTAB 1995). Relevant evidence "may be offered and the respective rights of the parties to registration should be determined on the basis of the facts as they exist up to and until the close of the testimony period." *Nark, Inc. v. Noah's, Inc.*, 212 USPQ 934, 944 (TTAB 1981).

## Jurisdiction

Here, the first condition to issuance of concurrent use registration(s), which is "primarily jurisdictional in nature," *In re Beatrice Foods Co.*, 429 F.2d 466, 166 USPQ at 436, has been met. In fact, the evidence of record is uncontroverted and consistent, and we find, that ABF adopted its marks in good faith, in its own geographic area of Central Florida, and without knowledge of Abbott's prior use of 3 PALMS. Abbott Test. Tr. 80:9-13, 81:23-25; Collins Disc. Tr. at 11-14 and 23-32 and Ex. 1; ABF's Int. Resp. No. 17; Collins Test. Tr. at 11-12; Elbers Disc. Tr. at 10-13; Yarborough Disc. Tr. at 10-12. Moreover, ABF "began using its mark for [its] services prior to the filing date of" Abbott's geographically unrestricted application. *CDS, Inc. v. I.C.E.D. Management, Inc.*, 80 USPQ2d 1572, 1580 (TTAB 2006). *See also, Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 3 USPQ2d 1306, 1308 (Fed. Cir. 1987); *Olé Taco Inc. v. Tacos Ole, Inc.*, 221 USPQ 912, 915 (TTAB 1984) (where uncontroverted evidence established the concurrent use applicant's use before the

excepted registrant's filing date, "[w]e have no reason to assume that this was other than an innocent use without notice of registrant's use and activity under the [involved] mark"). Under circumstances such as those presented here, "it is settled law that each party has a right to use its mark in its own initial [geographic] area of use." *Weiner King, Inc. v. The Wiener King Corp.*, 615 F.2d 512, 204 USPQ 820, 829 (CCPA 1980); *Woman's World Shops Inc. v. Lane Bryant Inc.*, 5 USPQ2d 1985, 1987-88 (TTAB 1985) ("concurrent use rights arise where a party, in good faith and without knowledge of a prior party's use in another geographical area, adopts and uses the same or similar mark for the same or like goods or services within its own geographical area with a measure of commercial success and public recognition without any resulting confusion as to source").[5]

While the parties' rights to *use* their respective marks in their initial areas of use are thus established, here, as in *Wiener King*, what remains "[i]n dispute … are the *registrable* rights to the remainder of the United States possessed by each party." *Wiener King*, 615 F.2d 512, 204 USPQ at 829 (emphasis supplied); *see also, Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc.*, 293 F.2d 685, 130 USPQ 412, 418-20 (CCPA 1961).

> We have concluded that in concurrent use proceedings in which neither party owns a registration for the mark, the starting point for any determination as to the extent to which the registrations are to be territorially restricted should be the conclusion that the prior user is prima facie

---

[5] In fact, like the concurrent use proviso of Section 2(d) of the Act which governs this proceeding, the common law also recognizes an exception to the general principal that a trademark's function is to identify a single source of a product or service. *Cf.*, *United Drug Co. v. Rectanus Co.*, 248 U.S. 90 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916); *see also*, *Nark, Inc.*, 212 at 943.

> entitled to a registration covering the entire United States. Such a prior user, who applies for a registration before registration is granted to another party, is entitled to a registration having nationwide effect no less than if there were no concurrent user having registrable rights. His rights and, therefore, his registration, should be limited only to the extent that any other subsequent user, who can establish the existence of rights earlier than the prior user's application for registration, can also prove a likelihood of confusion, mistake or deception.

*In re Beatrice Foods*, 429 F.2d 466, 166 USPQ at 436. However, this presumption, articulated in *Beatrice,* can be overcome, as further discussed *infra.* In this case, as in *Wiener King*, the parties' dispute over registrable rights is somewhat complex, because as between the parties, ABF, the concurrent use applicant, sought registration first and "underwent a large portion of its expansion after notice of the existence of" Abbott and his prior use of 3 PALMS in Arizona. *Wiener King*, 615 F.2d 512, 204 USPQ at 829. In any event, before considering the geographic scope of the parties' registrable rights, if any, we first consider the second "condition precedent" or threshold question, i.e. whether, with an appropriate geographic restriction, there would "be no likelihood of confusion, mistake or deception in the market place as to the source of the goods resulting from the continued concurrent use of the trademark." *In re Beatrice Foods*, 429 F.2d 466, 166 USPQ at 435-36.

**Likelihood of Confusion**

The parties' services are identical, and in the absence of any limitations as to channels of trade in ABF's involved applications, ABF's services are presumed to be offered in all normal channels of trade for hotel services. *Octocom Systems, Inc. v. Houston Computers Services, Inc.*, 918 F.3d 937, 16 USPQ2d 1783, 1787 (Fed. Cir.

1990). Moreover, the evidence of record establishes that the parties' services in fact are offered in the same channels of trade, specifically the Internet.

The parties' marks are also at least somewhat similar. ABF seeks concurrent use registrations for the following marks:



while Abbott uses 3 PALMS in standard characters and in the following form:

. Because the literal elements of the parties' marks are in part identical, and both parties' marks include representations of palm trees, consumers may very well be confused if the parties' marks were used in the same geographic area. However, that is not the question before us.

The question before us is whether a likelihood of confusion would be avoided by a geographic restriction. We find based on the record herein that confusion would not be likely with an appropriate geographic restriction. First, ABF has established that PALMS is used by a number of third parties for hotel services, and that such third party hotel services are marketed and sold via the Internet, so much so that OCEANA PALMS, ROYAL PALMS, ROYALE PALMS, COLONY PALMS, DESERT PALMS, THE PALMS HOTEL, THE PALMS HOTEL & SPA, PALMS and many other PALM marks for hotels coexist, including, in some cases, in the

same state, are advertised on the Internet, and many have valid and subsisting federal trademark registrations on the Principal Register without any geographic restrictions.[6] And the evidence establishes that a number of hotels not only use the word PALMS, but do so with a design including palm trees, such as Abbott's and ABF's marks in this case. Accordingly, Abbott's mark is quite weak as a result of widespread third-party use throughout the country, which significantly minimizes the likelihood of consumer confusion. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 109-10 (CCPA 1974) ("The expressions 'weak' and 'entitled to limited protection' are but other ways of saying . . . that confusion is unlikely because the marks are of such non-arbitrary nature or so widely used that the public easily distinguishes slight differences in the marks under consideration . . . ."); *In re Hartz Hotel Services, Inc.*, 102 USPQ2d 1150, 1155 (TTAB 2012) ("Because of the highly suggestive nature of the mark 'Grand Hotel,' the proliferation of registered 'Grand Hotel' marks and the unregistered uses of 'Grand Hotel' marks, the mark 'Grand Hotel,' itself, is entitled to only a very narrow scope of protection or exclusivity of use … we conclude that consumers are able to distinguish between different GRAND HOTEL marks based on small differences in the marks …"); *In re Broadway Chicken, Inc.*, 38 USPQ2d 1559, 1565-66 (TTAB 1996) ("Evidence of widespread third-party use, in a particular field, of marks containing a certain shared term is competent to suggest that purchasers have been conditioned to look to the other elements of the marks as a means of distinguishing

---

[6]    *See e.g.* Registration Nos. 2027319, 2528623, 2736238, 2773483, 3026530, 3391678, 3144011, 3341336, 3537139, 3594538, 3698800 and 3781730.

20

the source of goods or services in the field."); *Steve's Ice Cream v. Steve's Famous Hot Dogs*, 3 USPQ2d 1477, 1479 (TTAB 1987).

Second, and perhaps more importantly, a geographic restriction would make confusion unlikely, especially where purchasers have been conditioned, when faced with hotel marks containing the terms PALM or PALMS, or designs comprised of palm trees, to consider other factors when choosing a hotel. In fact, we have often found that a geographic restriction is sufficient to avoid confusion between identical or highly similar marks (some apparently stronger than those involved here), which are used for identical or highly similar goods or services. *See e.g., Wiener King*, 615 F.2d 512, 204 USPQ 820 (concurrent use registrations for WIENER KING with and without design for hot dog restaurants issued despite geographically separate use of WEINER KING with and without design for hot dog restaurants); *CDS Inc.*, 80 USPQ2d 1572 (concurrent use registration for THE COPY CLUB for copying and related services issued despite geographically separate use of COPY CLUB for identical services); *Georgia-Southern Oil Inc. v. Richardson*, 16 USPQ2d 1723 (TTAB 1990) (concurrent use registration for HUNGRY HARVEY for retail convenience store services issued despite geographically separate use of HUNGRY HARVEY'S for restaurant and convenient store services); *Pinocchio's Pizza Inc. v. Sandra Inc.*, 11 USPQ2d 1227 (TTAB 1989) (concurrent use registration for PINOCCHIOS for restaurant services featuring pizza issued despite geographically separate use of PINOCCHIO'S for restaurant services, and despite finding "that confusion in the marketplace, if the marks are used in the same geographical area,

21

is not only likely but certain"); *Thriftimart, Inc. v. Scot Lad Foods, Inc.*, 207 USPQ 330 (TTAB 1980) (concurrent use registration for THRIFTIMART for retail supermarket services issued despite geographically separate use of THRIF-T-MART for identical services).  As the predecessor to our primary reviewing court stated:

> Opposer seems to regard it as an impossibility that two parties can own and register the same trademark.  Not only is that a commonplace where there is sufficient difference in goods, even as to identical marks … but the concurrent registration provisions of section 2(d) contemplate it even in the case of the same or similar goods.

*Alfred Dunhill*, 293 F.2d 685, 130 USPQ at 418.

While Abbott acknowledges that the parties offer hotel services under their respective 3 PALMS marks in geographically distinct physical locations, he nonetheless argues that because both parties "cater to those who travel to different locations to use the services," and the parties' marketing efforts "overlap" on the Internet, which is in fact the "channel of distribution" for the parties' services, the relevant territory here "is the entire country."  Abbott's Trial Brief at 20-21.  We disagree.  Hotel services are by definition rendered in a particular geographic location, even if they are also offered, by the same ultimate source, in other geographic locations under the same mark.  In fact, a hotel's physical location is among its most salient features, as Abbott himself essentially acknowledged.  Abbott Disc. Tr. at 80-81 ("or you're going to search for the geographic, you might say "Scottsdale hotel").  Thus consumers, already conditioned to focus less on PALMS and palm trees than other features of the parties' marks, will also be

unlikely to be confused because those searching for an Arizona hotel will not encounter any of ABF's 3 PALMS hotels.

Furthermore, while the record establishes that both parties make extensive use of the Internet, and that the Internet is a vitally important channel of trade and distribution for the parties' hotel services, we do not believe that this renders the Act's concurrent use proviso moot in this case.

> Obviously, the concurrent use provision in the Trademark Act existed long prior to the creation of the Internet. We do not believe that the creation of the Internet has rendered the concurrent use provision of the Trademark Act moot. Indeed, in a case that predated the Internet but nonetheless involved advertising and customer solicitation in overlapping areas, the Federal Circuit determined that concurrent registrations were still acceptable. In *Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank*, 842 F.2d 1270, 6 USPQ2d 1305 (Fed. Cir. 1988), the parties had agreed that the New York bank was entitled to nationwide registration with the exception of the state of Illinois. However, the agreement specifically noted that "nothing in this agreement will preclude Amalgamated New York from conducting advertising which might enter in the State of Illinois or from dealing with customers who happen to be located in the State of Illinois." 6 USPQ2d at 1306. A similar provision applied to the Illinois bank. While that case involved a consent agreement, it is clear from the decision that overlapping advertising and customer solicitation does not require a determination that there is a likelihood of confusion. *See also Terrific Promotions*, 36 USPQ2d at 1352 (Mention of concurrent user in in-flight airline magazine and *New York* magazine did not prevent issuance of concurrent use registrations).

*CDS Inc.*, 80 USPQ2d at 1583. Furthermore, in *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 249 F.3d 564, 58 USPQ2d 1710, 1717 (6th Cir. 2001), cited in *CDS*, a junior user was enjoined from using its mark in the

geographic area where the prior user had superior rights. However, the appellate court "declined to affirm" the district court's holding that its injunction "necessarily precludes any use of the mark by the [junior user] on the Internet." Instead, the case was remanded with instructions for the district court to consider "cases addressing the role of national advertising by parties with concurrent trademark rights." In such cases, courts have found that the elimination of all possible confusion which might arise from overlapping advertising is not necessary. *See e.g.*, *Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc.*, 831 F.2d 1177, 4 USPQ2d 1709, 1714 (1st Cir. 1987) ("While we recognize that some consumer confusion may result because there will be some overlap in advertising, the Lanham Act does not require the complete elimination of all confusion."); *All Video, Inc. v. Hollywood Entertainment Corp.*, 929 F. Supp. 262, 40 USPQ2d 1130, 1135 (E.D. Mich. 1996) ("Congress recognized and accepted that some level of confusion would inevitably result from allowing a limited defense for junior users"). And here, it is important to keep in mind what Abbott advertises and sells via the Internet – hotel rooms located at his sole 3 PALMS location in Scottsdale. *Cf. Over the Rainbow*, 227 USPQ at 883-84 (finding likelihood of confusion because "[u]sers have franchise stores and have had mail order sales in many of the same states where applicant now has licensees," recognizing that "[t]his is not a case where the senior user has been content to limit the use of its mark to a relatively small geographic area and has not sought to expand its business either in volume or geographic area").

Because Abbott has not expanded beyond the single Scottsdale location, and the record does not establish that Abbott's 3 PALMS hotel enjoys a reputation beyond Arizona, the fact that both parties' services are promoted and offered online is not enough to result in a likelihood of confusion.

> We do not doubt that Brennan's New Orleans's history is notable. But virtually all the articles and reviews discuss Brennan's New Orleans in the context of the City of New Orleans or a trip to New Orleans. This evidence in no way demonstrates that potential diners in *New York City* who find the word Brennan's on a restaurant awning will have any reason to think the restaurant is connected with Brennan's New Orleans, or even will have heard of Brennan's New Orleans. This is especially true because Brennan's New Orleans has not expanded in or near New York, defendant Terrance Brennan has his own reputation in New York, and Brennan is a common name.

*Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 69 USPQ2d 1939, 1944 (2d Cir. 2004) (emphasis in original). In *Brennan's*, the Court "did not disagree with" what is essentially Abbott's argument here, that "[c]ertain businesses such as hotels, and to a lesser degree restaurants, attract the traveling public. Courts have recognized that even businesses that are separated by large distances may attract overlapping clientele due to the ease of travel." Nevertheless, the Court found that "in the absence of actual confusion or bad faith, substantial geographic separation remains a significant indicator that the likelihood of confusion is slight," and that "geographic remoteness is critical in this case." The Court went on to affirm the denial of a preliminary injunction because the plaintiff failed to establish a likelihood of confusion. *Id.* at 1945-46. *Cf. Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 146 USPQ 566 (7th Cir. 1965) (finding likelihood of confusion between

25

two geographically separated hotels based on plaintiff's extensive national advertising, the parties' virtually identical marks including virtually identical stylization, and the finding that "defendants adopted plaintiffs' name deliberately with a view to obtaining some advantage from plaintiff's investments in promotion and advertising"); *Stork Rest. v. Sahati*, 166 F.2d 348, 76 USPQ 374 (9th Cir. 1948) (finding likelihood of confusion between a geographically separated bar and nightclub, where the plaintiff was called "the best and most publicized night club in the entire world," and found to have a strong mark, and "[t]he conclusion [was] inescapable that the appellees are seeking to capitalize on the publicity that the appellant has built around the name").

In short, the evidence in this case does not establish that Abbott's mark is even close to as strong as the plaintiffs' marks in *Tisch* and *Stork*, or even for that matter as strong as the plaintiff's mark in *Brennan's*, nor does the evidence establish that consumers outside of Arizona are familiar with Abbott's Scottsdale hotel. To the contrary, in his brief, Abbott clearly states that he "does not purport to have a nationwide reputation." Abbott's Trial Brief at 26. And here, there is no evidence that ABF adopted Abbott's mark with the intent to capitalize on it, which further distinguishes this case from *Tisch* and *Stork*.

Finally, we find that the lack of actual confusion in this case is at least somewhat relevant. Abbott claims that the parties' use of 3 PALMS has "overlapped" on the Internet for approximately four years, and in fact this is Abbott's primary argument in support of a finding that there is a likelihood of

26

confusion between the parties' marks.  As a result of this overlapping Internet use for several years, "we find that there has been a reasonable opportunity for confusion to have occurred and that the lack of any reported instances of confusion weighs against finding that there is a likelihood of confusion."  *Citigroup Inc. v. Capital City Bank Group, Inc.*, 94 USPQ2d 1645, 1662, (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011).  To the extent that the parties' marks appear in close proximity on "tripadvisor.com" or elsewhere on the Internet, that mere proximity does not equate to actual confusion, especially where the parties' hotels are listed separately, and Abbott does not claim otherwise.

### Territory

Having determined that confusion is not likely with an appropriate geographic restriction, we must now determine the geographic territory to which each party is entitled.  In doing so, we are not limited to considering only ABF's actual trademark use prior to Abbott's filing date.

> The Commissioner of Patents has the statutory responsibility to make sure that concurrent registrations are limited so as to prevent the likelihood of confusion, mistake or deception from occurring.  Where a party has submitted evidence sufficient to prove a strong probability of future expansion of his trade into an area, that area would then become an area of likelihood of confusion if a registration covering it was granted to the other party.  For example, many forms of evidence which would ordinarily be proffered to show a likelihood of *expansion* would be the same kind submitted to argue a likelihood of *confusion* if another party began use of the mark in that area.  Thus, based on the premise that territorially restricted registrations must issue and, further, that said registrations combined will encompass the entire United States, if a likelihood of confusion is to be avoided, the

27

> territories of the parties must be limited in such a way as to exclude from each the area of probable expansion of the other party.

*In re Beatrice Foods,* 204 USPQ at 437-38.  More specifically,

> actual use in a territory [is] not necessary to establish rights in that territory and the inquiry should focus on the party's (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and, where applicable (5) possible market penetration by means of products brought in from other areas.

*Wiener King*, 615 F.2d 512, 204 USPQ at 830.

Furthermore, as the predecessor to our primary reviewing court pointed out in *Wiener King*, "there is a policy of encouraging prompt registration of marks by rewarding those who first seek registration under the Lanham Act," in this case ABF.  *Id.*, 204 USPQ at 830.  Perhaps not coincidentally, the concurrent use proviso of Section 2(d) "exhibits no bias in favor of the prior user."  *Id.* at 831.

With these principles in mind, we find that ABF has established rights in the territory claimed in its involved applications, i.e. "the entire United States except the state of Arizona."  Abbott's use of 3 PALMS has been static, limited to providing hotel services in Scottsdale, Arizona since his date of first use.  While Abbott has expressed to friends and colleagues an intention to expand his use, none of his 40-50 offers to acquire additional hotels for operation under the 3 PALMS mark has been accepted—a fact which severely undermines the probative value of his alleged expansion plans.

28

For example, in another case, the New York-based excepted user owned a single store in New York City operating under the involved mark, and eventually opened a second New York City store which later closed. It also presented testimony that it "was looking into opening" a new store in Pittsburgh, to the point that it was "proceeding with the construction." By contrast, the concurrent use applicant was rapidly expanding in many states and introduced more "definite" evidence of further expansion plans. The Board granted a concurrent use registration to the applicant for the vast majority of the United States, excluding the areas around New York City and Pittsburgh. *Terrific Promotions Inc. v. Vanlex Inc.*, 36 USPQ2d 1349, 1353-54 (TTAB 1995). *See also*, *Noah's Inc. v. Nark, Inc.*, 560 F. Supp. 1253, 222 USPQ 697, 701 (E.D. Mo. 1983), *aff'd*, 728 F.2d 410 (8th Cir. 1984) ("a senior party may abandon its right as a prior user to expand into a particular area or its right to enjoy nationwide protection of its mark" where it does not actively expand).

Here, Abbott's evidence of 3 PALMS-related activity or intentions beyond Arizona consists solely of Abbott's own testimony and testimony from Abbott's friends and colleagues. There is no documentary evidence of Abbott's 3 PALMS-specific expansion efforts or even his 3 PALMS-specific intentions. In *CDS Inc.*, 80 USPQ2d at 1582, we found similar testimony insufficient standing alone, and do so here. *See also*, *Georgia-Southern Oil*, 16 USPQ2d at 1726 ("Other than the above referenced testimony, the record is silent regarding any additional expansion plans by applicant.") and *Olé Taco*, 221 USPQ at 917 (declining to include in applicant's

29

territory several areas requested by applicant because "the details are somewhat sketchy and not sufficiently documented to establish a truly intensive effort"); *cf. Rivard v. Linville*, 133 F3d 1446, 45 USPQ2d 1374, 1376 (Fed. Cir. 1998) (in abandonment case, affirming Board's finding that the registrant did not intend to commence use of his mark, despite his testimony to the contrary, where the registrant merely "made sporadic trips to the United States, cursory investigations of potential sites for salons, and half-hearted attempts to initiate the business relationships necessary to open a salon").  Of course, there is also no evidence that Abbott has ever come anywhere close to "proceeding with the construction" of any additional 3 PALMS hotels.

ABF, by contrast, has established with clear evidence that it has expanded significantly while Abbott's business remained static.  From its origins in Florida, ABF's 3 PALMS brand grew to the point that ABF now uses 3 PALMS for at least eight hotels, located on the East Coast, in the Midwest and on the West Coast. ABF's Int. Resp. No. 5; Mathon Test. Tr. Exs. 9, 13; Collins Test. Tr. p. 9, 18; Elbers Test. Tr. p. 26.

Under these circumstances, Abbott "through inaction over a considerable period of time, abandoned [his] right to expand use of the mark … outside of [his] trading area; and that by virtue of such abandonment, [Abbott's] prior use of the mark cannot serve to preclude [ABF], a[n] innocent user, from filling the territorial void left by" Abbott.  *Nark, Inc.*, 212 USPQ at 947.  We further find that ABF's previous business activities and expansion, to the point of using 3 PALMS for hotels

throughout most regions of the United States, entitles it to the territory requested in its involved applications, especially because ABF was the first to seek federal registration. *Wiener King*, 204 USPQ at 830-31.

**Decision**: Applicant is entitled to concurrent use registrations for the marks 3 PALMS HOTEL & Design, 3 PALMS RESORT & Design and 3 PALMS HOTELS & RESORTS & Design, as shown in application Serial Nos. 77425965, 77425988 and 77425996, for the identified services in the United States, its territories and possessions, excluding the State of Arizona. If and when the parties' geographically unrestricted applications are published for opposition and not opposed, the Board may issue an order to show cause why those applications should not be subject to the same geographic restrictions.

***